Good morning. May it please the court, my name is Ralph Blumers and with me at council table is Oliver Stiefel. I represent Central Oregon Landwatch and Waterwatch of Oregon. I would like to focus this court's attention today on how the agency made an arbitrary decision not supported by law by only considering two alternatives that involved the exact same amount of key points and save about five minutes for rebuttal. Pretty ambitious. If the court upholds the use of an EA that only presented two alternatives, both of which authorized the exact same amount of resource use, that holding would be directly inconsistent with the holding in Western Watershed Project v. Abbey. In Abbey, this court held that an EA involving four alternatives, a no action, which involved continued grazing, and three action alternatives, which authorized up to the exact same amount of resource use. But can I stop you there because it seems to me that the threshold question is whether the agency was right in basically saying, in defining the purpose of the project, right? Because if, this is the Forest Service's agency, right? If they're allowed to say that the purpose of the project has to be that the City of Bend gets to keep basically taking as much water as it has in order to, I guess it takes 50% of its water usage from the river, right? If that's the purpose of the project is to maintain that, it seems to me that all of your arguments on this point that you're going to try to stress just fall away. And so I struggled with, well, were they permitted to do that? And the answer I tentatively came to was, yeah, it seems like they could do that, that they could prioritize the meeting of the city's water needs, essentially over the harm to the fish, perhaps, given the, especially given the long historical track record that the city had in taking this water. So maybe you could help me there, because if you fail on that point, then Western water, Western watersheds is easily distinguishable, it seems to me. Yes, thank you for that question, Judge Watford. I think that the purpose of need is not problematic. It's written quite broadly. Yes, it is to authorize new infrastructure to deal with the intake facility, but specifically in the record, in the decision notice and finding of no significant impact, signed by the forest supervisor, that the forest supervisor says that, you know, the purpose is to and upgrade the infrastructure, while limiting the city to conveying no more water than it uses under the current pipeline. So that did not prevent conveying less water with that pipeline. I have two questions about the whole, this whole approach. First of all, the Forest Service's decision whether to grant permit or not to grant a permit, as to a certain amount of, as to using forest service land for this. Is that right? That's correct. I'm sorry, what? That's correct, Your Honor. And though the city, the way this is the way the city defines the project or its needs, the question. That's one question I had. I don't know the answer to that, but it's a question. And the second related question is, it seems to me that there are myriad decisions where somebody comes in and say, I want to build a ski resort or I want to build a, I want, I want to cut down trees or I want to do whatever I want to do. And then the, the answer isn't, well, if you want to cut down trees, then we're only going to consider cutting down trees. We're also going to consider not cutting down trees. So I know there's, so I guess the question is, what exactly, where does the case law leave the question of how much the definition of the project becomes controlling where, from the federal decision maker's point of view, one possibility should, well, sorry, you can't do the project, even though you want to do the project. Yes. I mean, I think this answers, answer both your question and Judge 's question, is that Supervisor Allen, in the decision notice on ER 280, specifically said, my task is simply to decide whether or not to grant the permit the city seeks, and if so, whether to modify its terms as may be necessary to protect federal resources. And as the, your, the decision you authored in Oregon Natural Resources, Oregon Natural Desert Association versus BLM from 2010, it states that the forest plan is the context in which, within which those decisions are made. And here, in Fish Standards, LH1 and LH3 specifically direct the Forest Service to consider either when renewing a permit, which was how they framed up the no action alternative, or issuing a new lease, to continue Judge Watford's question, or my question, about how controlling, and in what respect, is the city's definition of what it was to accomplish by the present project? That's, in Fish Standards, down the line, but how controlling is it? In my, my response is it's not controlling, and I would point this court back to the Muckleshoot decision, where there was a land exchange at issue, and yes, that case involved in the EIS, but the land exchange that was proposed, was proposed in a particular way, and the Native American tribe suggested other alternatives. And the court ruled that even if those alternatives involved things that were either off the federal land, or other alternatives that weren't proposed by the proponents of that land exchange, that the Forest Service was obligated to consider them if they were feasible. One of the alternatives that the Forest Service, but, but, I'm getting stuck, because I, just circle back and try to do this again, because I just, what you said at first didn't register. I thought they came, the Forest Service came out of the box, and said, the, what we have to ensure is that the city gets to basically meet 50% of its water needs from the river. It's going to be allowed to take up to, whatever it is, is it 18 CFS, whatever the maximum it ends up meeting. That, that feature of this project, this upgraded infrastructure, has to be maintained, because the city doesn't have the right to get water elsewhere. And we're not going to basically just leave it high and dry and say, yeah, that's your problem. Go figure out where, where you're going to get some extra water from. So if you start from the premise that the Forest Service was allowed to set that as essentially the baseline, that any alternatives we're going to consider have to at least allow the city to meet its water needs from the existing resources that are there, then actually the alternatives you are proposing aren't feasible. And that's why Western Watersheds is distinguishable, because they're, they said, we said that all the other alternatives weren't feasible, and the agency failed to consider them here. They said, we didn't consider them, because they wouldn't meet the purpose of the project. So that's why, for me, it all comes back to, well, was the Forest Service allowed to define the purpose of the project in that way or not? And I guess it seemed to me that was just arbitrary and capricious review. And one of the allowable uses of natural resources within the, the, the natural forests are allowing municipalities to meet their water needs. And so the Forest Service here prioritized that need over perhaps harming the fish, and I'm not sure that there's any reason why they can't do that. So that's what I need help with, I think, from you. Yes, and let me help you with that. So one of the things that Supervisor Allen acknowledged in the record, which is at ER 288, is that it was incorrect for the Forest Service to assume that it cannot impose a flow restriction on the city's use of the pipe. That's at ER 288. And it says, quote, the Forest Service's ample authority under FLPA to impose and enforce a limitation on the city's use of the pipe. And that is supported by this court's decision in County of Okanagan. So the purpose and need, to get directly to that question that you're, you're pinpointing there, was to maintain a dual source system. But it wasn't a purpose saying we have to maintain the same amount of water withdrawal and ignore forest plant standards. So, there seems to be some tension and disagreement with the, with your opponents as to whether you raise the question of the fact that the other alternative should have been no permit or, or just leaving this present permit in effect until 2019 and just, and not saying anything about after that. Or should the alternative have been less water, but not no water? Which is, are you arguing both? You should have done both those things, or what? Well, with respect to exhaustion, um... Well, I first want to know, substantively, what are you now arguing? At least one alternative that considered a lesser amount of resources. Lesser, not necessarily none. Not necessarily just leave the current permit and maybe, not, okay. So now you're arguing for lesser water. Then there is an exhaustion issue. Well, I think the record has many citations in it. Extensive assertions by our clients that the Forest Service should consider reduced water use to meet in-stream flow needs. To meet the standards of NFISH with respect to temperature, which haven't been met for many years in the NFISH reach. And Water Watch of Oregon specifically identified a number, 11.72 CFS, as an alternative that was based on state water rights related to in-stream flow needs. The Central Oregon Land Watch retained a hydrogeologist, an expert, who provided some figures about how much future reductions in the water would occur and what that would affect, how much that would affect temperature negatively, increased temperature. There's just many, many references. And I think that it was the duty of the Forest Service under Section 102.2e of NEPA to identify alternatives. And that is regardless of whether plaintiffs raise specific detailed options, it's the Forest Service's obligation to develop those. But the record is very clear that the plaintiffs raised the issue of reduced resource use as an option for the Forest Service to consider. And the reason for that is that Tumalo Creek has not been meeting the NFISH standards for temperature for some time now, both for adult rearing habitat and spawning habitat and holding habitat. And one of the things, one of the points that I wanted to address is that the Forest Service summarily concluded that the chosen action alternative would trend towards attainment of the NFISH temperature standards. But I would urge this Court to carefully read the NFISH section of the EA, which is found in ER 525 to 530, and the that it quickly evaporates. And that every time Well, let me ask a prior question. Suppose it didn't evaporate. Suppose that there were a trend, but that in the end, under this permit, the NFISH standards wouldn't be met. Does that meet, would that meet the statutory or the NFISH requirement with regards to not preventing the attainment or not? You have pinpointed a very important question, which is, when, if I may state it back to you, when does NFISH require the attainment? Essentially, yes. In other words, we now have a 20-year permit. Right. And we know, even if they're right about the flow. Yes. That it's not going to be attained in those 20 years. Yes. Okay. Does that violate the NFISH standard or not? The answer to your question, Judge Parzon, is that the NFISH standard must eventually be attained and that the Forest Service must demonstrate how its decision will result in it eventually being attained. And we must remember that NFISH was adopted 22 years ago, in 1995, and incorporated in the Forest Plan. And now we have a permit for another 20 years. And so that's 42 years out that we're looking at the end of the life of this permit. And the Forest Service has never demonstrated in the EA how it will achieve NFISH compliance, when it will attain. This benefit is a slight improvement. It's ephemeral. It's qualified. It's only when in distribution or when there will be more water. We're still looking at the ER at 456. Well, I understand. You're saying it's always going to be better in the summer because of this distribution. And for a while it's going to be better otherwise. Yes. And those statements are qualified. Benefits, they say, quote, benefits decreased as demand increases over time. And, quote, when in distribution. And then the key one is that in-stream flow benefits realized through the operation of the proposed system would taper off to the in- stream flow conditions we have today. And we're already past the point. If you look at the chart at the top of ER 456, at 2015, all 18.2 is taken in April, May, June, July, August, September, and October. That benefit, which is heavily touted, does not meet the NFISH standard of eventually showing how this degraded system will get there. And NFISH specifically says in its standards, LH1 and LH3, if adjustments are not effective, eliminate the use. One of the disputes between you and them, I think, is that they say you're not focusing on the 3.8 miles and that the rest of the stream is just not their problem. Yes. So one of the points that you see made in the amici briefs is that downstream the Tumalo Irrigation District takes a lot of water. So whatever we do upstream doesn't matter. But there's 12 miles of stream that are not affected by Tumalo Irrigation District whatsoever. And only 3.8 of those miles are covered by NFISH, right? 3.8 of them. 3.8 of them are subject to NFISH. And the other piece that you should remember, Judge Berzon, is that the irrigation withdrawals are not happening six months of the year. And there's also a lot of efforts being made by the Tumalo Irrigation District to improve those lower miles. So really, ultimately, it's the Forest Service's job, going back to your earlier question, does it have to just consider what the permittee has put forward or the proposed permittee has put forward? No. It has to consider other feasible alternatives, which includes, I submit, groundwater only. That is a project off federal land alternative, which you must consider. And that allows it to essentially do a true no action, which it didn't do, so you can really see the full scope of the impacts of this water withdrawal to allow it to be contrasted with what they're proposing. Yeah, but tell me if I'm not remembering this right. But I thought the problem with the groundwater extraction was that that ended up really producing no net benefit to the stream. Because if you're going to take out that extra water from groundwater sources, then it's just that much less water is making its way into the stream via springs and the like, right? Your Honor, that would potentially be true. Groundwater and surface water are interconnected. If that groundwater withdrawal were happening in the Tumalo Basin near the in-fish reach, but it's not. It's happening downstream. There is a mitigation program for groundwater impacts, and the record is currently has enough groundwater permits to provide 140%, more than 100%, of its total water needs. So it might not end up being the chosen alternative, Your Honor, but it would be best explored in an EA and where those kinds of claims could be fully disclosed and vetted by the public versus just made in defense of simply eliminating it from detailed study. But going back to the main thing that we're asking for is a reversal and an alternative that allows the Forest Service to demonstrate compliance with in-fish, the benefits of reduced withdrawal through this new pipeline that has already been built, and how those benefits would translate now and into the future into decreased colder water for fish in light of the other water in the basin, which is a pretty dire forecast for this stream and that there's plenty of evidence in the record that there's available methods to quantify those impacts, and that's just what was absent. We have two alternatives with the exact same amount of resource use, and the focus of this Court's analysis in WWP versus Abbey is on what was authorized. So any potential for future conditions on that as a result of monitoring, those might be helpful, but the focus is on what was authorized. And what was authorized was 18.2, no action, continue the permit even though it was conspiring by its own terms and it wasn't a property right, and 18.2 under the new one. And what we were asking for is something with reduced withdrawal so that at some point, 22 years since NFISH has been adopted, and 20 years into the future, we would know that the stream would be providing the temperatures needed for red band trout. Was NFISH in effect at the time? It certainly wasn't in effect at the time the current system was constructed. Was it in effect at the time of the last permit? Yes. NFISH was adopted in 1995. The first of the existing two pipelines that were decommissioned, one was in the 20s and one was in the 50s. What exactly happened at the time of the last permit renewal? There was no review as far as I'm aware of compliance with NFISH at that time. When was it? The last permit I think was, the City of Bend could probably provide these under a permit as well. And that one expires coming up in 2019. So it was in the late 1999 maybe or 2000, but I'm not exactly sure. Is this whole fight going to be reprised in 2019 when the permit renewal issue comes up? Because that seems, now that the thing is built, the infrastructure is built, this seems to me the question is how much water should be taken. You can have a bigger pipe than the amount of water you allow. So is all of this just going to come up again in 2019? The new permit expires in 2029. It was the old permit, Judge Watford, that expired just automatically by its terms, and there was no expectation that it would be continued. And I just quickly will point you to that so you can look at that permit. That is in the SCR at 485, and it says this permit will expire at midnight. It shall not require notice of any decision document or any environmental analysis or other documentation. And that's why our position was that the no action alternative was not properly cast as the automatic continuation of that permit. In addition to all the points they made about how the existing infrastructure was subject to imminent failure, then they took the position that it would automatically be renewed as part of the no action, which didn't make sense to the public and didn't provide a reasonable comparison for the effects of returning more water to Tomahawk Creek. Thank you. Good morning, Your Honors. May it please the Court. Emily Polachek for the United States. In the courtroom today is Defendant John Allen and other members, other Forest Service employees. I'll be taking about ten minutes of the appellee's allotted time, and the subsidiary will take the remainder. In the time I have, I'd like to address two issues, the Forest Service's compliance with NIFMA and the riparian management objectives, and the agency's selection of alternatives under NIFA. As a first order, though, I think it's important to clarify what is before the Court. As the Court seems to be aware, we're talking about several different segments of the Tomahawk Creek. Subreach A1 is the one that is most affected here by the action. That reach runs from where the city takes out its diversion on Bridge Creek down to where the outback facility, where the water is treated and where the water that under the previous system the city didn't use would have been sent back into the stream. The plaintiffs have cited several things dealing with in fish, saying that the standards have not been met in years. But as noted in the amicus briefs and in our brief, they're taking those numbers from Reach B, which is after the Tomahawk Irrigation District has taken out its water. So those numbers don't reflect the portion of the stream that is actually at issue in this case. But that portion is not in compliance either, if you looked at it as a discrete portion. It has not been in compliance during certain months of the year, but again, that's unaffected by this action here, because regardless, even if the city took less water out, the Tomahawk Irrigation District has sufficient water rights that it would take the water out in Reach B. So any change here isn't going to affect the amount of water that is in Reach B, because that happens after. But it's going to affect the amount of water that's in Reach A1. Right. That is the only reach that we're really talking about. And Subreach A1 has been in compliance with the in-fish standards in the 3.8. How long has it been? There are a couple months of the year and a couple years. It's dealing with, you know, because there's different snowfall and rainfall, but especially since this new system has started, that area has been in compliance with in-fish. The portions that are in the Forest Service. Is that in the record? That's not in the record, because that's new data dealing with the operation of the new facility, because the facility has been built and is operational at this point in time. Which also brings up the fact that plaintiffs had previously asked for an injunction in this case. It seems that they are no longer asking for that, which is of note. It seems that they are alleging only procedural errors here, and that they say in their reply brief that they're not asking for the new system to be removed, and that they do not contest that the city has a right to a dual water system. Additionally, there was some talk about the purpose and needs statement earlier. The plaintiffs have not challenged the purpose and needs statement here as improper in any way. But more generally, if you can answer the question that I was asking before. If someone comes in and says, let's suppose that there hadn't been any water taken after this, and the city shows up and says, we want to build a pipe and we want to take some water out, and our purpose is now to have a dual system, and so on and so on. If that controls the NEPA analysis, so that anything that any plan considered has to meet those specifications for this purpose, an outside entity, then it seems to me that most of what goes on with regard to the alternatives analysis goes up in smoke. Because the whole point of that analysis is to decide whether we're going to let this outside entity do what it wants to do. And one possibility is that we don't allow it to do what it wants to do. So why isn't that always on the table? Or we do it less, or we do it differently. I don't understand this. I know there's some case law that uses this terminology, but then there's western watersheds or a lot of other cases which are specific about it. And others, which I think without being specific, always considers the possibility that these people are going to not be allowed to do what their project wants to do. Sure. And I mean, I think the answer, the EAs and EISs often do explore alternatives that do not meet a purpose and need statement, and then those alternatives are rejected for not meeting the purpose and need. Here, to the respect, to the question that there is no real, no federal action alternative here has to be looked at in context. Here, the city has been taking a team. I'm not saying there's no federal action. There is a federal action, whether approved or not. Right. At the end, that alternative. I mean, a no federal action alternative. Like, that the no action alternative here would have been no federal action. There would have been no diversion on forest design. They're now arguing that it should have been less diversion, which is, you know, an obvious alternative. Well, and I'm unclear as to their argument whether they're saying that should have been the no action alternative or that that should have been included in their alternatives analysis. I understand that to be saying it should have been one or the other, and they would take simply one that would have said, don't take 18.2, whatever the measure is, take 15.1. Sure. So to the extent that then we're talking about the adequacy of the range of alternative study, which is a different question than whether or not this no action alternative was appropriate, the Forest Service did look at the effects of a reduced flow in the river. There's a specialist report that was adopted into the EA that looked at the effects in the river of taking the demand that the city had in 2011, which was less than the 18.2 CFS. And so it looked at the effects of diverting that amount of water. There's also a lot of comparisons to the natural flow of the river. But other than the 2011 demand, there was no suggestion during the comment period that the Forest Service look at any other specific amount. So they weren't adequately put on notice that that was something that the public wanted to see. Nevertheless, the fact that that analysis exists in the EA is important because the NEPA is governed by a rule of reason. And the idea is that the decision maker is supposed to be well informed when making a decision about the proposed action. Here the Forest Service looked at what would happen with reduced flow alternatives. It was aware of those effects on the stream, and the proposed action here had beneficial effects. I note that opposing counsel had talked about the fact that the city in the future will be taking the full 18.2 CFS, and that that means that there's no difference in the outcomes here. But the fact of the matter is that in low flow months when there's been not enough snowfall or rain to cover all of the appropriated amounts, the Oregon Water Master appropriates the water based on the appropriations that each water user has. So if the city is told that it can't take its full 18.2 CFS under the old system, it would have still taken that full 18.2 CFS out of the stream. That water wouldn't have been in the stream through sub-reach A1. It would have then been returned to the portion that the city had been told it couldn't use. That would have been returned in the return flow, which is just a ditch that, you know, allows sediment to then get back in the water as well. Under the new system, the city can stop that diversion before the water comes out of the creek, so that if they are told that they can't have the full 18.2 CFS, that water will stay in sub-reach A1. And that's how we're ensuring that sub-reach A1 has lower water temperatures, even in the high-demand summer and irrigation district months, or irrigation season months. That doesn't go, though, to the point that the cap shouldn't be 18.2. It should be, you know, 11-point-something, right? That at least should have been considered as an alternative. I guess I thought your response was, well, no, that wasn't explored in any depth because it wouldn't meet the purpose and need of the project. Well, and that is absolutely true as well. Well, but if that's the response, I guess I'm still stuck sort of like a broken record. I'm stuck at that same question I had on the outside, which is, why do you get to just say the baseline is 18.2 and any alternative that doesn't meet that is out the window? Well, but the Forest Service did look at what would happen if they were taking less than 18.2 CFS. For example, they looked at what would happen if the city took less than that. But it didn't consider it as an alternative. It wasn't considered as an alternative, but it is in the analysis. So, therefore, it was not, I mean, your point seems to be that they could not consider it as an alternative, to go back to Judge Watford's point, because they could simply say it doesn't meet the standards that the city wanted. But this is ultimately supposed to be an aid to decision-making. And if they're not going to consider it as an alternative because simply, then they are allowing the city to define the parameters of the plan because it's just not an alternative they even considered. The fact that they looked into what the effects would have been if they considered it, doesn't advance the notion that they never considered it as an alternative. That's true, except that some of these alternatives that were studied show why the, you know, in addition to not meeting the purpose and need, these other alternatives wouldn't have met. For example, the forest plan itself, which recognizes that there is a bend municipal watershed management area specifically in the forest for the purpose of providing a quantity and quality of water for domestic use. Well, that's true, a quantity and quality. So, it could be 15 or it could be 18. How much should it be? Well, and so the Forest Service also looked at what would happen if the city was not getting all of its surface water. It looked at the fact that then the city would need to supplant that with groundwater. The Forest Service found that, and this was actually Plaintiff's own expert, said that if the city had to replace 10 CFS, which would be half the amount that, you know, approximately half the amount it gets from surface water, with groundwater, it would have to go out and have to get new groundwater rights. So, pumping that water up from the ground would use more energy, which is going to have adverse environmental effects. And then Plaintiff's own expert said that pumping the groundwater would also have negative effects on the surface water in the springs that feed the Tumalo Creek. But I thought I heard your opponent say that the city already has groundwater rights to satisfy 140% of its needs. And I think if you look at the amicus briefs in this case that were submitted by the state and by the water districts, you'll see that that's actually an inaccurate calculation. And the city may be able to answer that question further. If there are any other questions specific to the Forest Service, otherwise I'd like to allow the city to have a chance to speak. Thank you very much. Good morning. Good afternoon, Your Honors. Albert Thurlow here on behalf of the city of Bend. I'd like to provide at the outset some perspective as to what this case is and how it impacts to the resource itself and to the city. The city has water rights on Tumalo Creek for approximately 36 CFS. It's been taking water from this creek, as Pellenson pointed out, since 1920 with one pipe. They built another pipe in 1950. And since that time, they've had a permit from the Forest Service to have those pipes cross Forest Service land. And they've been withdrawing water from the creek all through that time. But the permit that allowed those two pipes to be built doesn't have a limitation on the amount of water the city can withdraw. The limitation on the city's ability to withdraw water was based on the capacity of the pipes. And at the early stages of the litigation, the plaintiffs, the appellants here, were arguing that the city was artificially establishing an 18.2 CFS capacity to the pipelines, and those pipelines could actually withdraw more. As a result, the city installed, at the Forest Service's request, the city installed meters that established that, yes, those pipes were limited by 18.2, but the CFS. But that limitation was not in the permit. The permit, if we had been able to withdraw more water through those pipes, the permit didn't stop us. The first permit that establishes a limitation on the city's ability to withdraw its water right, the water that are subject to its water rights on that creek, is the permit that's in front of the court today. And that is a limit that the city itself imposed on itself. It said, we've been withdrawing at the point. I was figuring out where all this is going. What's it relevant to? Pardon me? I don't understand what all this is relevant to. It's relative to the question of looking at alternatives, what the city is, what the city's purpose is for this. Why is the city's purpose the question? The alternatives are with regard to the federal project, no? That's true, Your Honor. And the federal project is giving a permit. Yes, Your Honor. And when you examine the EA and you look at the Forest Service's decision, both lower flow alternatives were considered. They were not considered in detail. They were looked at and discarded for various reasons, some of which were it would require the city to use more groundwater. And, by the way, the city does not have the ability under current groundwater rights to supply 140% of its water. That's simply wrong. It's a claim that plaintiffs have made throughout that we have rebutted throughout this litigation. It is not correct. But looking at the EA, the EA looked at various alternatives that would restrict the flow. There was one called the one-pipe alternative. And this is when the challenge to the project was not the amount of water flowing through the existing balloon pipe, but whether or not to grant the authority to build the new system. And at that time, one of the alternatives that was looked at, well, just take the water through one pipe. That would cut it in half. That was rejected because the pipe, that one pipe, would still need to be replaced. The impacts, the physical impacts of putting in the pipe would be the same. And there was no demonstrated benefit to water temperatures outside of, in Reach B, which is where all of the temperature gauges were in existence. The temperature numbers that you see in the record come from Reach B. Pardon me? All of them do? I thought that there were separate temperature measures for Reach A1. There was one temperature gauge, I believe, Your Honor, in Reach A that was in sporadic use and wasn't providing reliable temperatures. One of the facets of this project, sorry, one of the facets of the new project and the new facilities is the installation of flow and temperature meters in Reach A so that the Forest Service and the public, because the information will be made public, can monitor temperature and flow in Reach A. And the Forest Service has reserved in the permit that's under, that's before the court, the ability to look at that data and change the terms of this permit if it finds that the temperatures in Reach A are exceeding the levels that they find appropriate. So the project itself and what this new project does is provides a state-of-the-art water supply system to the City of Bend that's part of its dual system. But the Forest Service, if it wanted to know, for decision-making purposes, what the water temperatures were in Reach A could have found out. They could have put a measure in, couldn't they have? They could have, Your Honor, yes. So if there's a problem with the data, it's the Forest Service's problem. The modeling that was done on the river, the creek for this, showed that the temperatures with their level of flow and the physical nature of the stream itself, that the temperatures within that Reach A were sufficient to meet the standards or to not actually to get into the in-fish standard itself. It wasn't going to retard the attainment. You're telling me they didn't have data? I'm sorry, Your Honor. You're telling me they didn't have data, although they could have had data? They could have had data. They had some data, but the data that they were looking at was down in Reach B. So how can they therefore know? Well, they know now with the new data. Well, I know that, but that's not the question. The question is when they made these decisions about what the impact of this plan would be, even though they didn't know what the water temperatures were, you're telling me now in the relevant area, how could they do that? Your Honor, the record shows that they did have temperature data in Reach A for. . . You would be saying two different things. No, I understand that, but the data itself was sporadic, and to the extent it shows anything, it shows that the water temperatures were sufficient for most of the year. And the benefit from this new project is to provide the ability to keep water in the stream that was previously taken out. It was under the old system. The ten-mile reach from the diversion to the inflow back into the stream wasn't used. All the 18.2 was taken out. Now, in order to meet the . . . we can only take enough water to meet demand up to 18.2. What we don't take, what we don't need, what isn't established by municipal demand, stays in the stream for that length of stream. That is a clear benefit to the habitat, to the fish, to the water temperatures. Just one question because your time is up. I didn't get to ask this stuff. I didn't ask it to the federal person, although I should have. What is your understanding, in the way we were talking before, about the infish standard? That is, as I understand this permit, the standards will not be met under the permit. Is that a violation of the forest plan incorporating infish because it's going to, over the next 20 years at least, it prevents the attainment of infish? Your Honor, I don't believe it's a violation because what you're dealing with for the infish, what I believe plaintiffs are talking about, or appellants are talking about, are what are called the RMOs, or regional management objectives. And as explained in the Forest Service's decision memo, those are objectives that require the application of a certain level of discretion on the part of the experts in the Forest Service to decide how best to meet those objectives while meeting other objectives within the forest. Well, but it says that you can't have adverse effects that prevent the attainment. And having, I can't, unless you look at it, unless your answer is, well, it doesn't have to be in the next 20 years, then this is preventing the attainment. Well, Your Honor, it's not. So where's that discretion? I'm sorry, Your Honor, it's to retard or prevent attainment. Right. And what the Forest Service found was that this does not retard attainment. Well, so what? What about preventing attainment? You can't retard it and you can't prevent attainment. Well, it's an either or, it's retard. Oh, that's not right. You cannot do either. Now you can do one or the other. My understanding of that is that for that guidance, you can, it's retard or. You don't retard it, it's okay if you prevent the attainment, as you were saying. I'm not saying that, Your Honor. I'm saying if a project that's being approved will not retard attainment, that's significantly different from preventing attainment. It doesn't make attainment, but it doesn't prevent attainment. It doesn't retard attainment. It doesn't make it worse. Prevents attainment? Why doesn't it prevent attainment to say that for the next 20 years, you can take out more water, so much water, that the standards will not be attained? Doesn't that prevent attainment? Well, Your Honor, I believe that the standards are being attained for most of the year, if not all of the year. And the findings that were made by the Forest Service on this particular point are entitled to a level of deference because of the technical nature. Just the fact of our conversation here in dealing with the technical nature of the findings that are required to determine. Yes, but there's a basic legal interpretation question, which is as to which perhaps there's some deference to the Forest Service, but I don't understand what they've said about that, except to read out to prevent attainment. Your Honor, all I can do is go back to what the decision memo says. And the decision memo by the Forest Service states a finding that based upon all the evidence in the record, the 100 pages of water flow and temperature analysis that's in there, the analysis of the in-fish requirements, the analysis of the aquatic water conservation strategy that's part of the Northwest Forest Plan, all indicates that granting this permit under these conditions at this point in time meets the standards and guidelines of the Forest Plan. Thank you, Your Honor. Your Honor, can we have a few more minutes? I'm not sure how it ended up there. That's over. That's over. Yes, you can have two minutes. Go ahead. She said three minutes. You went three minutes over. Go ahead. Okay, thank you. With respect to the temperatures, ER 525, it says the only long-term monitored temperature site within lands managed under in-fish is near the downstream end of sub-reach A1B. Here, the seven-day maximum of 15 degrees C was exceeded four years out of five between the years of 1999 and 2007. So it's clearly in the EA, despite what the Forest Service represented before you today, that it's not attaining. And then it says down below, for the 8.9 spawning rearing temperature, this RMO is not met at all times for the summer months under existing conditions within sub-reach A1B. So that's the in-fish reach. It's not met. Now, Judge Watford, you asked about purpose and need, and initially perhaps some of the confusion there comes from the Forest Service's initial response was when the public asked for a groundwater-only alternative, they said that wouldn't meet the city's need, and they eliminated it from detailed study. And if you look at the EA, they did discuss groundwater only and eliminated it from detailed study, but they never discussed a reduced-withdrawal alternative, despite the representation they made today. If you look at the EA, you cannot find it anywhere that there was a reduced-withdrawal alternative discussed. Now, with respect to in-fish and whether in-fish is demonstrated in the EA to eventually be attained at some point within the life of this permit, ER-526 just has... Well, where are you getting within the life of this permit? I mean, that's the ambiguity in the in-fish, right? Well, in-fish does state that in the standards that priority is given to deal in adjusting permits to deal with adverse impacts to fish, and the purpose of in-fish was to restore these systems. If you look at the record, ER-1064 and the rest of in-fish, that whole introductory part before the riparian management objectives are presented and before the standards are presented, it states that the purpose of in-fish is to provide these habitat conditions so that flows are restored, fish passage and reproduction and growth is restored, and it says without these benchmarks provided by measurable riparian management objectives, habitat suffers a continual erosion, which the context conveys that there's an intent to get there at some point, and what we're saying is the EA does not demonstrate that they'll get there at some point, and specifically if you look at ER-526 where the conclusion is made that they're trending towards attainment, which, you know, as we did earlier, that trend is ephemeral, but they reference back to a different set of modeling that they did, but that was all based off of an 18-degree centigrade temperature standard that's required by state water quality laws. It does not address the in-fish one of 15 degrees or the 8.9 degrees one for spawning and rearing, so it's just simply not in the record, and if you look at the forest service in the city of Bends brief, they can't direct you all to anywhere in the record where that analysis was performed because it wasn't performed, and it wasn't performed with respect to reducing the withdrawal to get there. It was currently they are not attaining. They needed to reduce the withdrawal to get there as in-fish specifically directs. Okay, thank you very much. Thank you all. Thank you very much for your questions. I think, again, I think we're done. I think we can make one quick additional point. Judge, do you have a question? Oh, I'm sorry. I'm sorry. I was going to reach down and grab one additional reference that addressed your question, Judge Berzon,  over its obligation to look at the impacts on the environment, and I would just point to the ONDA v. BLM decision at 625 F3rd 1092, and the pinpoint is 1124, where it states uncritical privileging of one form of use over another violates NEPA, and that's also cited in a case in our reply brief at page 21, which is the National Parks Conservation Association v. USBLM. Okay, thank you very much. Thank all of you for your argument. The case of Central Oregon Land Watch v. Cardinal Naughton is submitted. Thank you.
judges: Berzon, Watford, Owens